UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Rochester MSA Building Company,
Rochester Math & Science Academy, and
Rochester Stem Academy Inc.,

        Plaintiffs and
        Counter-Defendants,

v.

UMB Bank, N.A., *as trustee*,

        Defendant and
        Counterclaimant.

File No. 21-cv-2559 (ECT/ECW)

**OPINION AND ORDER**

---

Colin M. Bruns and Richard G. Jensen, Fabyanske Westra Hart & Thomson, PA, Minneapolis, MN, for Plaintiffs and Counter-Defendants Rochester MSA Building Company, Rochester Math & Science Academy, and Rochester Stem Academy Inc.

Ryan T. Murphy, Joseph J. Cassioppi, and Samuel Andre, Fredrikson & Byron, PA, Minneapolis, MN; and Adrienne K. Walker, Locke Lord LLP, Boston, MA, for Defendant and Counterclaimant UMB Bank, N.A.

---

Together, Plaintiffs own and operate two public charter schools and were loaned more than $15 million in bond proceeds by the City of Rochester, Minnesota, to finance the improvement and expansion of their facilities. After Plaintiffs defaulted on promises to maintain minimum levels of cash on hand and income available for debt service, they entered a forbearance agreement with Defendant UMB Bank, the indenture trustee of the bonds. In that agreement, Plaintiffs took on new obligations, like more frequent financial reporting, implementing the recommendations of a business consultant, and retaining an

independent business manager.  Plaintiffs also agreed to pay certain fees and expenses UMB incurred.  Plaintiffs filed this lawsuit over the reasonableness of fees that UMB has tried to collect under the forbearance agreement.  UMB has asserted counterclaims, alleging that Plaintiffs defaulted on their obligations under the forbearance agreement and underlying bond agreements.  UMB has now moved to appoint a general receiver.  Because UMB has not shown its entitlement to the extraordinary remedy of receivership at this early stage, the motion will be denied.

I[1]

*The Parties.*  Plaintiffs Rochester Math & Science Academy ("RMSA") and Rochester Stem Academy Inc. ("RSTEM") are Minnesota nonprofit corporations formed as public charter schools under Minn. Stat. § 124E.06 (collectively, the "Schools"). Wilkinson Decl. ¶¶ 4–5 [ECF No. 10].  RMSA runs a kindergarten through grade 8 charter school, *id.* ¶ 4, and RSTEM runs a grade 9-12 charter school, *id.* ¶ 5.  Plaintiff Rochester MSA Building Company ("RMSA Building Company") is a Minnesota non-profit corporation that owns the facilities where the Schools operate.  *Id.* ¶ 3.  UMB is a national bank with its main office in Kansas City, Missouri.  *Id.* ¶ 2.

*Plaintiffs were loaned bond proceeds, and UMB is the current trustee of the bonds under an indenture of trust.*  In September 2018, the City of Rochester, Minnesota, issued two series of bonds under an Indenture of Trust with UMB, as trustee for the bond owners: (1) $15,555,000 Minnesota Charter School Leases Revenue Bonds, Series 2018A and (2)

---

[1]     These facts are drawn from the parties' submissions and, unless otherwise noted, have not been disputed.

$305,000 Minnesota Taxable Charter School Leases Revenue Bonds, Series 2018B (the "Bonds"). *See* Indenture of Trust [ECF No. 10-1]. The City loaned the Bond proceeds to RMSA Building Company to "(i) finance the acquisition, renovation, expansion and equipping" of the facilities where the Schools operate, including a 25,000 square-foot addition; "(ii) fund a debt service reserve fund; (iii) pay a portion of the interest on the Bonds; and (iv) pay the costs of issuing the Bonds." Loan Agreement at 1 [ECF No. 10-2]. The Bonds are secured by and payable from amounts held under the Indenture of Trust; by payments from RMSA Building Company under the Loan Agreement; by a mortgage lien on, and a security interest in, essentially all of RMSA Building Company's assets; and through assignments of scheduled rent payments by the Schools to RMSA Building Company that are sufficient to pay the principal and interest on the Bonds. *See* Mortgage, Security Agreement & Assignment of Rents, Art. II [ECF No. 10-3] ("Mortgage"); Pledge & Covenant Agreements §§ 2, 4, 8 [ECF No. 10-5] ("Pledge Agreements"); Lease Agreements [ECF No. 10-4].

*In connection with the Bonds, Plaintiffs took on many financial covenants.* Among them, they agreed to maintain minimum amounts of cash on hand and income available for debt service. First, RMSA agreed to maintain at least 60 days' "unrestricted" cash on hand in its operation fund "through the Fiscal year ending June 30, 2019[,] and each Fiscal Year thereafter." Pledge Agreements § 3(G). RSTEM agreed to maintain at least 30 days' cash on hand for the fiscal year ending June 30, 2019, and 45 days' cash on hand for each fiscal year thereafter. *Id.* Second, both Schools agreed to use "best efforts to maintain Income Available for Debt Service of at least 120% of the principal and interest due on the Bonds

and any Additional Bonds in each fiscal year." *Id.* at §§ 3(O).  The parties agreed that the Schools' cash on hand and debt service coverage ratio would be tested at the end of each fiscal year and that the Schools' failure to meet the contractual benchmarks could trigger other obligations.  If either School missed its cash-on-hand requirement or maintained income available for debt service of less than 110% of the principal and interest due on the Bonds for that fiscal year, the parties agreed that the School

> shall retain an Independent Consultant, to review and analyze the reports required by this Agreement, to inspect the Facilities and the School's operation and administration of the School and the Facilities as such Independent Consultant deems appropriate, and the School shall accept or adopt the consultant's recommendations unless they are contrary to State or federal law.

*Id.* §§ 3(G); *see also id.* §§ (3)(O) (substantially similar language).  Further, either School's failure to achieve a debt service coverage ratio of 100% at the end of a fiscal year would constitute an "Event of Default" that triggered the trustee's right to "exercise one or more of the remedies permitted under the Loan Agreement and the Indenture."  *Id.* §§ 3(O).

*UMB's predecessor trustee hires an independent consultant to study Plaintiffs' business after concluding that Plaintiffs breached financial covenants.*  On July 14, 2020, U.S. Bank[2] sent Plaintiffs an Initial Notice of Default declaring that RSTEM had breached the cash-on-hand covenant and that both RSTEM and RMSA had breached the income-available-for-debt-service covenants for the fiscal year ending in June 2019.  ECF No. 10-7.  Attached to the Notice was a document showing that RSTEM missed its cash-

---

[2]    Although UMB is the original and current indenture trustee, it was temporarily replaced by U.S Bank National Association, N.A.  UMB "has recently resumed its role as indenture trustee."  Wilkinson Decl. ¶ 2 n.1.

on-hand benchmark by nearly $30,000 ($133,803.92/$166,439.92), and that both RMSA (29%) and RSTEM (103%) missed their debt service coverage ratio. *Id.* at 9. The Notice stated that the Schools' failure to fulfill these financial covenants triggered their obligation to retain an independent consultant, and that RMSA's failure to maintain at least 100% of income was "an automatic Event of Default . . . under the Pledge Agreement, and thereby also under the Loan Agreement and the Indenture." *Id.* at 4–6. The Notice relayed that, at the direction of the majority bondholder, U.S. Bank had already hired Pathway Learning Center as an independent consultant to "review and provide recommendations regarding the 2019 Financial Covenant Defaults and other pertinent matters, in the manner contemplated in the Pledge Agreements." *Id.* at 6. Finally, the Notice enclosed two reports that Pathway had authored and stated that, going forward, Plaintiffs were required to provide Pathway "all requisite[] access and information on a timely basis" and use "best efforts to adopt and implement" Pathway's recommendations. *Id.* at 6–7. In its initial April 2020 report, Pathway raised concerns over the Schools' operations—including apparent failures to capture available state funding—and Pathway "describe[d] goal and strateg[y] recommendations for both operational and academic programs." *Id.* at 11–32. In a July 2020 update, Pathway stated that, "[s]ince March 2020, [Pathway had] supported both schools and secured over an additional $150k through Erate funds FY school year 2020-2021 with annual residuals of $40k." *Id.* at 24. Pathway projected that, "[u]pon successful implementation of recommendations, strategies[,] and additional grants, . . . both schools could save and revenues [sic] totaling over $3-5 million in the next 5 years." *Id.*

*Although Plaintiffs worked in some capacity with Pathway beginning in March 2020, they disputed parts of Pathway's reports and the Notice of Default.*  Plaintiffs raised two "primary objections" in a September 10, 2020 email.  ECF No. 10-10 at 2.  First, Plaintiffs noted the trustee had not "asked [them] about hiring" Pathway, as required by the Bond agreements,[3] nor solicited their "input into the scope or work" that Pathway performed.  *Id.*  Second, Plaintiffs asserted that Pathway's reports contained "incorrect" findings and that its recommendations carried "unreasonable" and "extraordinary" costs that "lessen[ed] the likelihood of success at educational and financial levels."  *Id.*  Plaintiffs pointed out they had "never missed a rent payment" despite unique financial strain caused by the COVID-19 pandemic.  *Id.* at 2–3.  Finally, Plaintiffs noted the Schools had fulfilled their obligations "with the sole exception of the financial covenants," which they would meet "as of July 1, 2020[,] when the [fiscal-year 2020] audit [was] completed."  *Id.* at 5.  In February 2021, Plaintiffs sent U.S. Bank documents purporting to "confirm[] that all covenants ha[d] been met" and warranted a "waiver of any default."  ECF No. 10-11 at 1, 3; *see* ECF No. 10-12 at 42.  U.S. Bank responded that "achievement of a covenant obligation in subsequent years [did] not trigger a waiver of an existing Event of Default" and that "[t]he Majority Bondholder and Trustee continue[d] to be rightfully concerned about [Plaintiffs'] failure to implement the recommendations of [Pathway], as [was] required under the Pledge Agreements[.]"  ECF No. 10-11 at 2.  Two weeks later, on

---

[3]     The parties defined "Independent Consultant" to mean a consultant "selected by [RMSA Building Company]."  Loan Agreement at 5; *see also* Pledge Agreements §§ 13 (stating that, with limited exception, undefined capitalized terms "shall have the meanings set forth in the Loan Agreement and the Indenture").

February 19, U.S. Bank sent Plaintiffs a Notice of Events of Default.  ECF No. 10-12.  This Notice reiterated that Plaintiffs' cash-on-hand and debt service coverage ratios for the 2019 fiscal year constituted an Event of Default, stated that Plaintiffs' failure to implement all of Pathway's recommendations was an additional Event of Default, and directed Plaintiffs to "use best efforts to adopt and implement" those recommendations within thirty days.  *Id.* at 3–5.

*On June 30, 2021, UMB—having resumed its role as trustee—sent Plaintiffs a Notice of Acceleration, Demand for Payment, and Reservation of Rights.*  ECF No. 10-13. UMB stated that Plaintiffs had still not implemented Pathway's recommendations and now claimed that Plaintiffs were "in default of their obligations to provide . . . copies of reports required under the Pledge Agreements, including without limitation, the quarterly reports pursuant to Section 3(C) of each Pledge Agreement."  *Id.* at 3–4.  The Notice informed Plaintiffs that all outstanding principal and interest was accelerated and deemed "immediately due and payable."  *Id.* at 4.

*On August 9, 2021, the parties entered a Forbearance Agreement that required Plaintiffs to pay certain fees and expenses.*  In it, they acknowledged UMB had given notice that "Events of Default have occurred (or will occur) and are continuing under the Bond Documents as a result of [Plaintiffs'] failure . . . to comply with certain covenants contained in the Bond Documents."  Forbearance Agreement at 2 ¶ G [ECF No. 10-14]. The Agreement termed those Events of Default the "Specified Defaults" and identified them as follows:

> (a) Failure to achieve at the end of Fiscal Year 2019 Income Available for Debt Service for RMSA in an amount equal to at least 100% of the principal and interest due on the Bonds; and
>
> (b) Failure of RSTEM to maintain at least 30 days unrestricted Cash on hand for the June 30, 2019 testing date . . . .

*Id.*, Ex. A.  UMB agreed, in exchange for Plaintiffs' commitment to achieve and maintain numerous "operating milestones," to "forbear from exercising remedies under the Bond Documents arising solely by reason of the Specified Defaults."  *Id.* §§ II, III.  Among the operating milestones, the Schools agreed to "retain Frank Yanez to serve as an interim business manager" with "exclusive power and duty to manage [their] financial operations."  *Id.* § II(a)(i).  Plaintiffs also agreed:

> to pay all fees and expenses of the Trustee (including, but not limited to, reasonable fees and expenses of its attorneys, advisors and other professionals) in connection with the enforcement or remedies, including negotiation, execution and enforcement of this Forbearance Agreement upon presentment thereof to [Plaintiffs] on a current basis in accordance with the provisions for payment of fees and expenses of the Trustee as set forth in the Bond Documents; *provided, however*, that nothing herein modifies, alters or amends the Trustee's respective rights under the Bond Documents to receive payment of its fees and expenses from other available Trustee held funds, including the Debt Service Reserve Fund.  For the avoidance of doubt, [Plaintiffs] agree[] to pay the fees and expenses set forth on Exhibit D on the Effective Date, and the Trustee and Majority Bondholder's current fees and expenses of its professionals within thirty (30) days of presentment thereof[.]

*Id.* § II(e).  Exhibit D was a U.S. Bank invoice reflecting an outstanding balance of $290,265.75 for "U.S. Bank Extraordinary Fees (May 2020 - June 2021)," "Legal expenses of Virtus LLP," "Legal Expenses of Greenberg Traurig," "FTI Consulting," and "Pathway

Learning Center." *Id.*, Ex. D.  The Forbearance Agreement also listed eight categories of "Forbearance Termination Events" that would cause UMB's forbearance obligations to "immediately and automatically terminate" and revive UMB's "rights and remedies specified under any of the Bond Documents or under applicable law." *Id.* § IV.  Upon the occurrence of a Forbearance Termination Event, Plaintiffs agreed "not to oppose, contest, or challenge, or to support any other party (directly or indirectly) in opposing, contesting, or challenging, the appointment of a receiver or other fiduciary to manage the operations of the Schools and take control over the Collateral." *Id.* § IV(b).

*Plaintiffs paid the fees in Exhibit D of the Forbearance Agreement but demanded itemization for subsequent invoices.*  Plaintiffs paid the $290,265.75 invoice attached to the Forbearance Agreement.  Ellingson Decl. ¶ 21 [ECF No. 20].  On October 12, 2021, UMB sent Plaintiffs two more invoices for $135,497.00 in fees incurred through June 30, 2021, and $194,019.31 in fees incurred from July 1 through August 31.  Ellingson Decl. ¶¶ 23–24, Ex. B.  These fees were for "UMB Bank Fees and Expenses," "Locke Lord LLP," "FTI Consulting," "Fredrikson & Byron," and "Morgan Lewis Payment Obligations pursuant to Forbearance Agreement." *Id.*  In an email, Plaintiffs requested that the bills be "broken down by date, hourly rate[,] and task being worked on related to RSTEM/RMSa [sic]." *Id.*, Ex. C.  UMB initially resisted this request, but later provided a one-page summary containing cursory descriptions of services performed by each vendor. *Id.* ¶¶ 27–28, Ex. D.  On October 29, UMB withdrew $331,632.47 from Plaintiffs' "reserve account" to satisfy the October invoices. *Id.* ¶¶ 29–30.

*Plaintiffs filed suit and UMB decided the Forbearance Agreement had terminated.*
Plaintiffs commenced this action by filing a summons and complaint against UMB in Minnesota district court on November 10, 2021. ECF No. 1-1. Plaintiffs served UMB with an amended summons and complaint on November 18. Not. of Removal ¶¶ 1–2 [ECF No. 1]; *see* ECF No. 1-1. In their complaint,[4] Plaintiffs seek various declaratory and injunctive relief. First, Plaintiffs seek declarations that the fees UMB assessed them are "excessive and unreasonable, and [that] Plaintiffs are not obligated to pay them" and that "Plaintiffs are not in default of any covenants or obligations under the Forbearance Agreement or the Transaction Documents." ECF No. 1-1 at 10 ¶ 49. Second, Plaintiffs seek an order "compelling [UMB] to provide Plaintiffs with a detailed breakdown of the fees included in the September 27, 2021 invoices; or, in the alternative, appointing a Special Master to review the detailed breakdown of fees assessed against Plaintiffs." *Id.* Last, Plaintiffs request an injunction that "prevent[s] [UMB] from taking any adverse action against Plaintiffs, including without limitation, declaring an Event of Default, seizing funds from Plaintiffs' account, appointing a receiver, or foreclosing on the Mortgage[.]" *Id.* On November 24, UMB informed Plaintiffs that they were considered to have defaulted under the Forbearance Agreement, "resulting in the occurrence of several Forbearance Termination Events." ECF No. 10-15 at 3. As examples, UMB identified

---

[4]    Plaintiffs did not file the amended summons and complaint in state court, although UMB filed it "on behalf of Plaintiffs" before removal and have included it with their removal papers. Not. of Removal ¶ 4; ECF No. 1-1 at 47–58. The amended complaint is identical to the original, save a correction to UMB's name. Thus, which complaint is operative has no bearing on the instant motion.

Plaintiffs' actions in filing this lawsuit, "fail[ure] to comply with their quarterly reporting" obligations, and failure to grant the interim business manager "sole and exclusive powers to manage the financial operations of the Schools." *Id.* at 4.   UMB then removed this lawsuit based on diversity jurisdiction under 28 U.S.C. § 1332, Not. of Removal ¶¶ 6–13, and has asserted counterclaims, ECF No. 2.   UMB alleges that Plaintiffs defaulted under various Bond agreements, including by not implementing Pathway's recommendations, failing to pay the accelerated Bond principal and interest of at least $15,490,000, failing to pay fees Plaintiffs were invoiced in connection with the Forbearance Agreement, not cooperating with the interim business manager, and filing this lawsuit. *See generally id.* UMB seeks various forms of relief, including monetary relief, declaratory relief, and appointment of a general receiver. *Id.* at 31–39.

*UMB sends another invoice and a breakdown of fees from the October invoices.* On December 9, 2021, UMB sent Plaintiffs an additional invoice for $106,185.50 in fees incurred from September 1 through November 30, 2021, including for legal services in connection with this lawsuit. Ellingson Decl. ¶¶ 32–33, Ex. E.   On December 17, UMB sent Plaintiffs itemized breakdowns of the October invoices. Bruns Decl. ¶¶ 2–3, Ex. A [ECF No. 21].

*UMB moves to appoint a general receiver.* UMB has now moved to appoint a general receiver. ECF No. 6.   Specifically, UMB seeks an order appointing Lighthouse Management Group, Inc. and granting it "powers co-extensive with those of a general receive[r] under Minn. Stat. § 576.29." ECF No. 12 at 8.   With its reply brief, UMB has submitted new evidence it says warrants receivership, including evidence that RSTEM's

net operating income for the fiscal year ending in June 2022, as of November 30, is estimated at -$90,802, that RSTEM is "currently estimated to not meet[] the [required] debt service coverage ratio" for the current fiscal year, and that the Schools have not fully cooperated with the interim business manager or delivered certain audited financial reports required under the Bond agreements.  *See* Suppl. Wilkinson Decl. [ECF No. 26]; Yanez Decl. [ECF No. 25]; Yanez Decl., Ex. A [ECF No. 25-1].  Plaintiffs oppose the motion.

## II

"[T]he appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." *Morgan Stanley Smith Barney LLC v. Johnson*, 952 F.3d 978, 980 (8th Cir. 2020) (quoting *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993)); *see* Fed. R. Civ. P. 66.  "The court may appoint a receiver as an ancillary, provisional action in connection with a pending matter, but 'a federal court of equity will not appoint a receiver where the appointment is not ancillary to some form of final relief [].'" *N.Y. Cmty. Bank v. Sherman Ave. Assocs., LLC*, 786 F. Supp. 2d 171, 175 (D.D.C. 2011) (quoting *Gordon v. Washington*, 295 U.S. 30, 38–39 (1935)).  "A receiver is an extraordinary equitable remedy that is only justified in extreme situations." *Aviation Supply Corp.*, 999 F.2d at 316.  "The party moving for the appointment of a receiver has the burden to establish that such an action is necessary." *Midwest Bank v. Goldsmith*, 467 F. Supp. 3d 242, 248 (M.D. Pa. 2020) (citations omitted).  "Although there is no precise formula for determining when a receiver may be appointed, factors typically warranting appointment are

[1] a valid claim by the party seeking the appointment;

12

[2] the probability that fraudulent conduct has occurred or will occur to frustrate that claim;

[3] imminent danger that property will be concealed, lost, or diminished in value;

[4] inadequacy of legal remedies;

[5] lack of a less drastic equitable remedy; and

[6] likelihood that appointing the receiver will do more good than harm."

*Aviation Supply Corp.*, 999 F.2d at 316–17 (citations omitted).

As an initial matter, the parties here dispute if and how the inclusion of receivership as a contractual remedy in the Bond agreements impacts the legal framework governing UMB's motion.  UMB asserts that Plaintiffs have "consented" to appointment and that, because the parties contemplated receivership in those agreements, "receivership loses its status as an extraordinary remedy."  Mem. in Supp. at 19 [ECF No. 8].  UMB says that its "bargained for" right to receivership is enforceable *without* resort to the aforementioned equitable factors.  *Id.* at 19–23 ("[Plaintiffs]' express contractual consent to the appointment of a Receiver should be dispositive[.]").  Plaintiffs disagree.  In their view, they have not defaulted on the Forbearance Agreement or caused a predicate Forbearance Termination Event to occur.  Plaintiffs say that to find a Forbearance Termination Event *did* occur, "the Court must first resolve the threshold issue of whether Plaintiffs have an obligation to pay the disputed fees."  Mem. in Opp'n at 14–19 [ECF No. 19].  Plaintiffs

dispute the various defaults that UMB alleges, *id.* at 19–25, and assert that UMB's efforts to collect fees without providing an itemization violated Minnesota law, *id.* at 12–13.[5]

"[C]ourts are split as to whether [] advance consent is dispositive or merely a factor to consider in the [receivership] analysis," and "[t]here does not appear to be any controlling law in the Eighth Circuit on this point." *PNC Bank Nat'l Ass'n v. Lee*, No. 4:13–CV–1482 CAS, 2013 WL 5532693, at *1 (E.D. Mo. Oct. 7, 2013). There are, however, some discernible trends. First, courts weighing the effect of a receivership clause consider whether it's genuinely disputed that a default sufficient to trigger the remedy of receivership has occurred. In rare cases, courts have found the absence of such a dispute enough to appoint a receiver without resort to equitable factors. *E.g.*, *U.S. Bank, Nat'l Ass'n v. C.B. Settle Inn L.P.*, 827 F. Supp. 2d 993, 997–98 (S.D. Iowa 2011). Other times, courts shift the burden to the nonmovant or find that a receivership clause, coupled with the absence of a genuine dispute as to default, weighs strongly in favor of receivership. *E.g.*, *Wilmington Tr., Nat'l Ass'n v. Winta Asset Mgmt. LLC*, 20-cv-5309 (JGK), 2020 WL 5802365, at *2 (S.D.N.Y. Sept. 28, 2020) (collecting cases). By contrast, when receivership is conditioned on an event of default, and the occurrence of such a default is

---

[5] At oral argument, Plaintiffs for the first time suggested that receivership would violate Minn. Stat. § 124E.07 by wresting authority from their board of directors to "decide and [be] responsible for policy matters related to operating the [S]chool[s], including budgeting, curriculum programming, personnel, and operating procedures." *Id.*, subd. 6. This argument is not persuasive. Many statutes, like § 124E.07, require organizations to establish a board of directors with certain powers. This does not mean that appointment of a receiver can never be appropriate.

genuinely contested or unclear,[6] courts afford less weight to the contract, the burden remains on the movant, and some variation of equitable factors control the analysis. *See Portland Marche, LLC v. Fed. Nat'l Mortg. Ass'n*, No. 3:21-cv-00569-IM, 2021 WL 2827476, *3 (D. Or. July 7, 2021); *see also Cargill v. HF Chlor-Alkali, LLC*, No. 16-cv-2506 (DSD/JSM), 2016 WL 4761729, at *2 (D. Minn. Sept. 12, 2016). Finally, courts have also considered the type of consent given: "consent[] to mere *application* to appoint a receiver" is afforded less weight than "consent[] to *appointment* of a receiver." *Sterling Sav. Bank v. Citadel Dev. Co.*, 656 F. Supp. 2d 1248, 1260–61 (D. Or. 2009).

Although the parties' inclusion of a receivership remedy in their agreements is a factor that will be afforded some weight, the equitable factors announced in *Aviation Supply Corp.* still apply, and the burden will remain with UMB to show its entitlement on balance of those factors. This is so for two reasons. First, Plaintiffs did not consent to receivership outright. At most, they agreed to "not [] oppose, contest, or challenge" appointment "[u]pon the occurrence of a Forbearance Termination Event." Forbearance Agreement § IV(b); *see also* Indenture of Trust § 9.05 (stating that RMSA Building Co. "may resist" trustee's receivership application); Mortgage § 2.5 (stating that, under certain

---

[6]     In this way, courts deciding receivership motions consider the movant's likelihood of success in the underlying action. The Eighth Circuit has not expressly adopted this factor, although other courts have. *See Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009) (considering movant's "probable success in the action"). Given the Eighth Circuit's consideration of this factor in the context of preliminary injunctions, and that receivership is a drastic form of preliminary relief, it's reasonable to conclude that UMB's likelihood of success factors in here, at least insofar as deciding the weight given to the parties' agreement that receivership was a remedy for the events of default that UMB alleges.

conditions, UMB would be "entitled to . . . *apply to the appropriate court* . . . for the appointment of a receiver") (emphasis added).   Second, in each instance, the parties conditioned the availability of receivership on some event of default.   *See* Indenture of Trust § 9.05; Mortgage § 2.5; Forbearance Agreement § IV(b).   Plaintiffs do not concede that a receivership-triggering default event occurred, and, at this early stage, there are legitimate disputes over each type of default event that UMB asserts.   Take them in turn.

First, UMB asserts that Plaintiffs' actions in "commencing this lawsuit and asserting claims and defenses," along with their failure to pay UMB's fees, constitute Events of Default under Sections IV(a)(5) and (8) of the Forbearance Agreement.   Mem. in Supp. at 16; *see* Reply Mem. at 12–14 [ECF No. 24].   But whether Plaintiffs' resistance to the fee invoices violates the Forbearance Agreement turns on yet-answered questions, such as the meaning and scope of Section II(e)'s fee provision and whether, as a factual matter, the fees fall within that provision.   If the unpaid fees were not incurred "in connection with the enforcement or remedies, including the negotiation, execution[,] and enforcement of [the] Forbearance Agreement," Forbearance Agreement § II(e), then UMB is not entitled to them.   The upshot would be that Plaintiffs' actions in disputing the fees—by not paying them or by filing this action—would not be a Forbearance Termination Event that triggers UMB's contractual receivership remedy.[7]   *See Bridgeport Music, Inc. v. Universal Music*

---

[7]     Relatedly, UMB argues that Plaintiffs' argument in this lawsuit that they "cured" earlier defaults of the cash-on-hand and income-available-for-debt-service covenants is a Forbearance Termination Event.   Reply Mem. at 12.   Not so.   Plainly, the point of Plaintiffs' argument is not that they never defaulted; the point is that earlier defaults which predated the Forbearance Agreement are not ongoing and therefore not a Forbearance

*Group, Inc.*, 440 F. Supp. 2d 342, 345 (S.D.N.Y. 2006) ("Even if it is ultimately determined that UMG's position as to the scope of the mechanical licenses prevails, it would not follow that Bridgeport has breached the contract for bringing a good faith, if unsuccessful, copyright infringement action in support of its position. . . . When parties have differing positions as to the meaning of a contractual term, it cannot be deemed a breach for one party to sue to enforce its view of the contract.").

Second, UMB asserts that Plaintiffs have not cooperated with the interim business manager, Frank Yanez. Yanez attests that the Schools have not implemented a marketing plan he believes necessary to "maintain and increase current enrollment" and that they did not "inform[] or consult[]" with him before filing this lawsuit. Yanez Decl. ¶¶ 6, 9. But the viability of this theory is also unclear. Plaintiffs offer competing testimony that the Schools have cooperated with Yanez to the "best of their ability" and "frequently communicate" with him, but that Yanez has "failed" to "keep the Schools involved in communications." Ellingson Decl ¶ 37. UMB's theory also depends on a favorable construction of the Forbearance Agreement. UMB theorizes that Plaintiffs' filing of this lawsuit without Yanez's approval violates the parties' agreement that Yanez would "[m]anage and control the Schools' cash management systems, including all disbursements to support the Schools' operating needs." Forbearance Agreement. § II(a)(i)(D); *see* Yanez Decl. ¶ 9. But this clause seems susceptible of a construction that does *not* require Yanez's approval for filing a lawsuit. More still, the Forbearance Agreement specifies that

---

Termination Event. *See* Mem. in Opp'n at 1–2 ("These defaults were demonstrably cured in early 2020, and Plaintiffs remained in compliance since that time.").

"termination of the Interim Business Manager" is a Forbearance Termination Event, suggesting that something short of that—*i.e.*, mere noncooperation—may not be. Forbearance Agreement § IV(a)(7).

Finally, UMB's remaining theories—that Plaintiffs have defaulted on their reporting obligations and not implemented Pathway's recommendations—are likewise disputed. Plaintiffs say they have fulfilled all reporting obligations and submitted their own evidence on this point. Mem. in Opp'n at 23; *see* Ellingson Decl. ¶¶ 35–36, Ex. F. Plaintiffs maintain that Pathway was "not properly appointed" and that its recommendations were "costly, vague, impossible to implement, and/or did not include specific action items to implement," but that "the Schools have continued to work with [UMB] towards Pathway's recommendations[.]" Ellingson Decl. ¶¶ 15–18. UMB has not offered evidence or discrete examples of ways the Schools have failed to implement Pathway's recommendations.

Against the weight given to the parties' contemplation of receivership as a contractual remedy, the remaining factors establish that UMB has not made the extraordinary showing required for appointment. UMB asserts valid claims to enforce its rights under the various Bond agreements, a factor that weighs in its favor. UMB does not, however, claim that fraudulent conduct has occurred or is likely to occur. Mem. in Supp. at 24 n.4. Critically, UMB also has not shown imminent danger that property will be concealed, lost, or diminished in value. UMB claims the Schools are mismanaged and offers concerns over their "financial direction," Yanez Decl. ¶ 7, but has not offered evidence that Plaintiffs are diverting or rapidly diminishing assets. Plaintiffs remain under

the supervision of an interim business manager with "exclusive power and duty to manage the financial operations of the Schools," Forbearance Agreement § II(a)(i), further lessoning the chance that property will rapidly diminish. Although UMB contends the Schools are "insolvent," this is something of a half-truth. Mem. in Supp. at 24. UMB's evidence shows the Schools are insolvent only by assuming that Plaintiffs are in default and more than $15 million in Bond debt has been accelerated. *See* Malloy Decl. [ECF No. 11], Ex. A [ECF No. 11-1], Ex. B [ECF No. 11-2]. Meanwhile, UMB does not dispute that Plaintiffs "have never missed a payment under the [B]onds." Ellingson Decl. ¶ 4. UMB's other imminent-danger evidence is an unaudited financial report showing that, for the fiscal year beginning in July 2021, RSTEM had a net operating income of -$90,802 through November 30. ECF No. 25-1 at 29. The report shows that, through November 30, RSTEM was well short of meeting its debt service coverage ratio for the current fiscal year. *Id.* at 25. This evidence of recent financial decline over a period of four or five months, however, does not amount to an "imminent danger" of property being lost. UMB still estimates the "book value" of the Schools' assets as high as $23.1 million, and it has a mortgage lien on, and security interest in, essentially all those assets. *See Signal Hill Serv., Inc. v. Macquarie Bank Ltd.*, No. CV 11–01539 MMM (JEMx), 2011 WL 13220305, at *25–26 (C.D. Cal. June 29, 2011) (finding no imminent danger when value of collateral appeared sufficient to pay the judgment). Plaintiffs also submitted evidence showing the Schools exceeded their cash-on-hand and debt service coverage ratio benchmarks for the two previous fiscal years and "continue[] to pay all their debts and apply for all available grants." Ellingson Decl. ¶ 6, Ex. A.

For many of the reasons it has not shown an imminent danger of loss, UMB also has not shown that it lacks adequate legal remedies or the absence of a less drastic equitable remedy. *See Hollywood Healthcare Corp. v. Deltec, Inc.*, No. 04-cv-1713 (RHK/AJB), 2004 WL 1118610, at *10 (D. Minn. May 17, 2004) (collateralized party "ha[d] available adequate legal remedies—i.e., exercising its rights as a secured party under the Uniform Commercial Code and seeking damages at trial"); *Signal Hill Serv., Inc.*, 2011 WL 13220305, at *28. The denial of the motion will be without prejudice to UMB filing a renewed motion for receivership on a more developed record or upon a material change in the Schools' financial circumstances. UMB also has less-drastic forms of injunctive relief at its disposal, such as a financial accounting or limited receivership.

Finally, the balance of harms weighs against receivership. A receiver offers added expense and diminished returns to the Schools, who continue paying for an interim business manager with "exclusive authority" over their financial operations. *See* ECF No. 25-1 at 30. Receivership also risks a decrease in student enrollment for the Schools—meaning reduced state funding—due to confusion or misconception in the community over the Schools' financial well-being. *See* ECF No. 10-7 at 11–32 (stating that "[e]nrollment modified to average daily membership is the driving factor in the funding" and setting goals to increase student enrollment); Yanez Decl. ¶ 6 (stating that the Schools are "struggling to maintain sufficient enrollment to meet their projections and maintain their financial obligations under the loan documents").

**ORDER**

Therefore, based on all the files, records, and proceedings in the above-captioned matter, **IT IS ORDERED THAT** Defendant and Counterclaimant UMB Bank, N.A.'s Motion to Appoint a General Receiver [ECF No. 6] is **DENIED**.

Dated: January 12, 2022                                      s/ Eric C. Tostrud
                                                                          Eric C. Tostrud
                                                                          United States District Court