UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Rochester MSA Building Company,
Rochester Math & Science Academy,
Rochester Stem Academy Inc.,

      Plaintiffs and Counter
      Defendants,

v.

UMB Bank, N.A., *as trustee*,

      Defendant and
      Counterclaimant.

File No. 21-cv-2559 (ECT/ECW)

**OPINION AND ORDER**

---

Colin M. Bruns and Richard G. Jensen, Fabyanske Westra Hart & Thomson, PA, Minneapolis, MN, for Plaintiffs Rochester MSA Building Company, Rochester Math & Science Academy, and Rochester Stem Academy Inc.

Joseph J. Cassioppi, Ryan T. Murphy, and Samuel Andre, Fredrikson & Byron, PA, Minneapolis, MN, and Adrienne K. Walker, Locke Lord LLP, Boston, MA, for Defendant UMB Bank, N.A., *as trustee*.

---

The Plaintiffs in this case—Minnesota nonprofit corporations that own and operate two public charter schools and the facilities in which the schools are situated—borrowed more than $15 million in bond proceeds from the City of Rochester, Minnesota, to finance the improvement and expansion of the schools' facilities. After Plaintiffs defaulted on promises to maintain minimum levels of cash-on-hand and income available for debt service, they entered a Forbearance Agreement with Defendant UMB Bank, the indenture trustee of the bonds. In that agreement, Plaintiffs accepted new obligations. These new obligations included replacing a financial vendor, retaining and giving some additional

authority to an interim business manager, and paying certain fees and expenses UMB incurred in connection with the default. Plaintiffs brought this case to challenge the reasonableness of fees UMB charged under the Forbearance Agreement. UMB counterclaimed, alleging that Plaintiffs defaulted on their obligations under the Forbearance Agreement and the underlying bond agreements.

UMB seeks partial summary judgment in its favor with respect to its breach-of-contract claim and against Plaintiffs' claims. If its motion is granted, then UMB seeks an order declaring that it is entitled to exercise all remedies available under the loan documents. To effectuate at least some of these remedies, UMB has asked that judgment be entered under Federal Rule of Civil Procedure 54(b).

UMB's motion for partial summary judgment will be granted on the basis of Plaintiffs' failure to replace their existing financial vendor. UMB's breach-of-contract claim remains unresolved to the extent the claim depends on UMB's theories that Plaintiffs failed to provide the interim business manager with sufficient authority over the Schools' operations and failed to pay certain fees and expenses. This also means that Plaintiffs' claims challenging the reasonableness of UMB's assessed fees survive. Because resolution of the parties' fee dispute may result in a setoff against the judgment sought to be made final, among other reasons, judgment will not be entered under Rule 54(b).

I

*The parties.* Plaintiffs Rochester Math & Science Academy ("RMSA") and Rochester Stem Academy Inc. ("RSTEM") are Minnesota nonprofit corporations formed as public charter schools under Minn. Stat. § 124E.06 (collectively, the "Schools"). ECF

No. 50-8 at 6, 8.  RMSA runs a kindergarten-through-grade-8 charter school and RSTEM runs a grade-9-through-12 charter school.  *Id.*  Plaintiff Rochester MSA Building Company is a Minnesota nonprofit corporation; it owns the facilities where the Schools operate and leases the facilities to the Schools pursuant to two lease agreements.  ECF No. 50 ¶ 3; ECF No. 50-4.  Defendant UMB Bank, N.A. is a national bank headquartered in Kansas City, Missouri.  ECF No. 50 ¶ 2.

*The bond documents*.  On September 1, 2018, the City of Rochester, Minnesota, issued two series of bonds under an indenture of trust with UMB as trustee for the bond owners: (1) $15,555,000 Minnesota Charter School Leases Revenue Bonds, Series 2018A, and (2) $305,000 Minnesota Taxable Charter School Leases Revenue Bonds, Series 2018B ("Bonds").  *See* Indenture of Trust [ECF No. 50-1].  On the same day, the City loaned the Bond proceeds to Rochester MSA Building Company to finance improvements to the facilities where the Schools operate, fund a debt service reserve fund, pay a portion of the interest on the Bonds; and pay the cost of issuing the Bonds.  Loan Agreement [ECF No. 50-2] at 6.  In turn, RMSA and RSTEM each executed pledge agreements—also dated September 1, 2018—in which they agreed to certain covenants and obligations with UMB Bank, as trustee.  ECF No. 50-5.  Among the covenants relevant to these proceedings, the Schools agreed to maintain certain levels of unrestricted cash-on-hand in their operating funds and to use "best efforts to maintain Income Available for Debt Service of at least 120% of the principal and interest due on the Bonds and any Additional Bonds in each fiscal year."  *Id.* at 5–6, 16–17.  If either School missed its cash-on-hand or income-available-for-debt-service requirements, it was agreed that the School would retain an

independent consultant to assess the operation and administration of the School, and that the School would "accept or adopt the consultant's recommendations unless they are contrary to State or federal law." *Id*. Further, either School's failure to achieve a debt-service coverage ratio of 100% at the end of a fiscal year would constitute an "Event of Default" that triggered the trustee's right to "exercise one or more of the remedies permitted under the Loan Agreement and the Indenture." *Id*. at 7, 18.

*The notice of default.* On July 14, 2020, U.S. Bank, the predecessor trustee,[1] notified Plaintiffs that RSTEM had breached the cash-on-hand covenant and that both RSTEM and RMSA had breached the income-available-for-debt-service covenants for the fiscal year ending in June 2019. ECF No. 50-7. The notice stated that the Schools' failure to fulfill these financial covenants triggered their obligation to retain an independent consultant, and that "because RMSA's Income Available for Debt Service was less than 100% of the principal and interest due on the Bonds and any Additional Bonds, an automatic Event of Default was triggered under the Pledge Agreement, and thereby also under the Loan Agreement and the Indenture." ECF No. 50-7 at 4–6. The notice also stated that, at the direction of the majority bondholder, U.S. Bank had hired Pathway Learning Center as an independent consultant. *Id*. at 6. The notice contained two reports authored by Pathway and directed Plaintiffs to provide Pathway "all requisite[] access and information on a timely basis" and use "best efforts to adopt and implement" Pathway's recommendations.

---

[1]     Although UMB is the original and current indenture trustee, it was temporarily replaced by U.S. Bank, N.A. ECF No. 10 at 2 n.1. UMB resumed its role as trustee in late 2021. *See id.*

*Id*. at 6–7.  Pathway questioned the Schools' apparent failure to capture all available state funding, its payment of overtime to salaried employees, conflicts of interest relating to RSTEM and RMSA Board members, and a lack of clarity about some of the Schools' employees' job duties.  ECF 50-8 at 12–15, 18.  It also recommended changing the Schools' financial vendor.  *Id.* at 15, 18.

*Plaintiffs' "waiver" suggestion and the second notice of default.*  In February 2021, Plaintiffs provided U.S. Bank with documents purporting to show that all covenants—if not met during the fiscal year ending June 2019—subsequently had been met;  Plaintiffs suggested "this warrant[ed] a waiver of any default."  ECF No. 50-11 at 3.  U.S. Bank responded that "achievement of a covenant obligation in subsequent years [did] not trigger a waiver of an existing Event of Default" and that "[t]he Majority Bondholder and Trustee continue[d] to be rightfully concerned about [Plaintiffs'] failure to implement the recommendations of [Pathway], as [was] required under the Pledge Agreements."  ECF No. 50-11 at 2.  Two weeks later, on February 19, U.S. Bank sent Plaintiffs a Notice of Events of Default.  ECF No. 50-12.  This Notice reiterated that Plaintiffs' cash-on-hand and debt service coverage ratios for the 2018/2019 fiscal year constituted an Event of Default, stated that Plaintiffs' failure to implement all of Pathway's recommendations was an additional Event of Default, and directed Plaintiffs to "use best efforts to adopt and implement" those recommendations within thirty days.  *Id*. at 3–5.

*The notice of acceleration.*  On June 30, 2021, UMB—having resumed its role as trustee—sent Plaintiffs a notice of acceleration, demand for payment, and reservation of rights.  ECF No. 50-13.  UMB explained that, in its view, Plaintiffs still had not

implemented Pathway's recommendations, and UMB claimed that Plaintiffs were in default of their obligations to provide copies of quarterly reports under Section 3(C) of each Pledge Agreement. *Id*. at 3–4. The notice informed Plaintiffs that all outstanding principal and interest was accelerated and deemed "immediately due and payable." *Id*. at 4.

*The forbearance agreement.* On August 9, 2021, the Parties entered a Forbearance Agreement. In the agreement, Plaintiffs acknowledged UMB had given notice that "Events of Defaults have occurred (or will occur) and are continuing under the Bond Documents as a result of [Plaintiffs'] failure . . . to comply with certain covenants contained in the Bond Documents." Forbearance Agreement [ECF No. 50-14] § G. The Forbearance Agreement identified those Events of Default as:

> (a) Failure to achieve at the end of Fiscal Year 2019 Income Available for Debt Service for RMSA in an amount equal to at least 100% of the principal and interest due on the Bonds; and
>
> (b) Failure of RSTEM to maintain at least 30 days' unrestricted Cash on hand for the June 30, 2019 testing date.

*Id*. at 19. In exchange for Plaintiffs' commitment to adhere to and maintain several "operating milestones," UMB agreed "to forbear from exercising remedies under the Bond Documents arising solely by reason of the Specified Defaults." *Id*. §§ II, III. Among the operating milestones, the Schools agreed to (1) "retain Frank Yanez to serve as an interim business manager" with "exclusive power and duty to manage [their] financial operations," *id*. § II(a)(i); (2) to undergo a process to—with Yanez's involvement—appoint a successor financial vendor, *id*. § II(a)(ii); (3) "to act in good faith to implement each of the Pathway

Recommendations to the extent feasible and permitted by law," *id*. § II(a)(vii); and (4) to pay certain fees and expenses of the Trustee "in connection with the enforcement or remedies, including negotiation, execution and enforcement of this Forbearance Agreement upon presentment thereof," *id*. § II(e). The Forbearance Agreement also listed eight categories of "Forbearance Termination Events" that would cause UMB's forbearance obligations to "immediately and automatically terminate" and revive UMB's "rights and remedies specified under any of the Bond Documents or under applicable law." *Id*. § IV.

*The fees dispute.* Plaintiffs paid a $290,265.75 invoice attached to the Forbearance Agreement, which reflected the outstanding balance of the predecessor trustee, U.S. Bank. *Id*. at 27–28.; ECF No. 20 ¶ 21. On October 12, 2021, UMB sent Plaintiffs two more invoices for $135,497.00 in fees incurred through June 30, 2021, and $194,019.31 in fees incurred from July 1 through August 31. ECF No. 20 at 4, 10–11. In an email to UMB, Plaintiffs asked that the invoices be broken down by date, hourly rate, and task—essentially the same information lawyers are expected to provide to a court evaluating a fee petition. *Id*. at 12–14. UMB initially resisted this request, but later provided a one-page summary containing cursory descriptions of services performed by each vendor. *Id*. at 5, 15. On October 29, UMB withdrew funds from Plaintiffs' debt service reserve fund to satisfy the October invoices. *Id*. at 5; ECF No. 51-14 at 2.

*This case.* Plaintiffs brought this case in Minnesota state district court on November 10, 2021. Compl. [ECF No. 1-1]. On November 24, UMB informed Plaintiffs that, in its view, Plaintiffs had defaulted under the Forbearance Agreement, "resulting in the

occurrence of several Forbearance Termination Events." ECF No. 50-15 at 3. UMB removed this lawsuit based on diversity jurisdiction under 28 U.S.C. § 1332, ECF No. 1 ¶¶ 6–13, and asserted counterclaims, alleging that Plaintiffs breached the Bond Documents (Count I), seeking appointment of a general receiver (Count II), and claiming entitlement to foreclosure of the mortgaged property (Count III). ECF No. 2 at 31–35. UMB further alleges that it is entitled to a declaratory judgment that Events of Default occurred under the Bond Documents, that Forbearance Termination Events occurred under the Forbearance Agreement, and that as a result UMB may exercise remedies, including "obtaining all rents, profits, and other income related to the Mortgaged Property, appropriating or applying all amounts held by the Debtors in the state revenue account, revenue fund, or otherwise under the Indenture, and any other remedy at law or in equity" (Count IV). *Id.* at 36–37.

## II

*The familiar summary-judgment standards.* Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255.

*The theory underlying UMB's motion.*   In its opening brief, UMB explains that it seeks partial summary judgment "on its counterclaims and the portions of [Plaintiffs'] claims seeking to preclude [UMB] from exercising its remedies." Def.'s Mem. in Supp. [ECF No. 48] at 1–2. Of UMB's four counterclaims, however, only one—Count I—alleges a cause of action in the legal sense—for breach of contract. *See* ECF No. 2 ¶¶ 109–123. The remaining three counterclaims seek remedies—the appointment of a receiver (Count II), a foreclosure decree (Count III), and a declaration that UMB is entitled to exercise all remedies available to it under the Forbearance Agreement and all other bond documents (Count IV). *See id.* ¶¶ 124–157; *id.* at 37–39. Thus, the starting point for determining whether summary judgment in UMB's favor might be appropriate is, in turn, determining whether there is no genuine dispute of material fact that Plaintiffs breached any of the several at-issue contracts. UMB's primary position seems to be that Plaintiffs defaulted under the Forbearance Agreement, and it is governed by Minnesota law. ECF No. 50-14 at IX(h). UMB says that Plaintiffs breached the Forbearance Agreement in three ways: (1) Plaintiffs failed to replace their financial vendor; (2) Plaintiffs have not provided Yanez, the interim business manager, the "exclusive power and duty" to manage the financial operations of the schools; and (3) Plaintiffs failed to pay UMB's fees. Def.'s Mem. in Supp. at 31–34. Relevant to all three of these theories, the Forbearance Agreement says that "[a] 'Forbearance Termination Event' shall be the occurrence of . . . [a]ny default of the terms of this Forbearance Agreement." *Id.* § IV(a)(2). For the Forbearance Agreement's purposes, the agreement's text reflects, and the parties seem to agree, that "default" is synonymous with breach.

*Basic relevant principles of Minnesota contract law.* The elements of a breach-of-contract claim under Minnesota law are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). (Here, the parties agree that the Bond Documents and Forbearance Agreement are valid contracts and that UMB performed all necessary conditions precedent. *See* Compl. ¶¶ 7–14; Countercl. ¶¶ 73–123. The Parties' dispute is all about whether Plaintiffs breached the Forbearance Agreement.) Under Minnesota law, "the primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003). When contract language is unambiguous, the "language must be given its plain and ordinary meaning." *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999) (footnotes omitted). A contract is ambiguous only when its terms "are susceptible to more than one reasonable interpretation." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018). "The determination of whether a contract is ambiguous is a question of law, but the interpretation of an ambiguous contract is a question of fact for the jury." *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003) (citations omitted). "[C]ourts should 'construe a contract as a whole'" and "'attempt to avoid an interpretation of the contract that would render a provision meaningless.'" *Qwinstar Corp. v. Anthony*, 882 F.3d 748, 754–55 (8th Cir. 2018) (quoting *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525–26 (Minn. 1990)).

*The financial-vendor issue.*  In the Forbearance Agreement, Plaintiffs agreed to meet a series of benchmarks to ensure that a successor financial vendor would be put in place at the Schools no later than November 19, 2021.  Forbearance Agreement § II(a)(ii).  Relevant to this issue, the agreement includes the following provision:

> *Appointment of Successor Financial Vendor.*  On or before the earlier of (a) the acceptance by each of the Schools' Boards of the 2020 annual financial audit, or (b) November 19, 2021, the Interim Business Manager shall engage a Successor Financial Vendor for the Schools that is acceptable to the Creditor Parties.  Under the direction of the Interim Business Manager, *the Schools shall meet the following benchmarks* in selecting the Successor Financial Vendor . . . .

*Id.* (emphasis added).  The agreement establishes a series of benchmarks the Schools agreed to meet, including identifying potential candidates, conducting interviews, delivering recommendations for a vendor to the Creditor parties, obtaining approval by the Schools' Boards, and entering into an engagement letter with the successor financial vendor.  *Id.*[2]

Plaintiffs have not replaced their existing financial vendor.  In failing to do so, they have defaulted on their obligations under § II(a)(ii) of the Forbearance Agreement.  The Forbearance Agreement unambiguously provides that the Schools bore the ultimate responsibility to replace their financial vendor.  Though the benchmarks were to be met "[u]nder the direction of the Interim Business Manager," the Forbearance Agreement

---

[2]     On September 17, 2021, the Parties agreed to amend the Forbearance Agreement to extend the successor financial vendor benchmark deadlines.  ECF No. 50-16 at 3.  The extension of these deadlines is immaterial to the outcome of UMB's summary-judgment motion.

makes clear that "the Schools shall meet the" benchmarks.  These provisions fall under §
II(a) of the agreement which provides: "The Obligated Group agrees that during the
Forbearance Period it shall operate the Schools and Property in good faith and shall adhere
to and maintain the following milestones" to include § II(a)(ii), titled "Appointment of
Successor Financial Vendor."   Forbearance Agreement § II(a).  This interpretation is
further cemented by § II(a)(vii), which required Plaintiffs "to act in good faith to implement
each of the Pathway Recommendations," which also included appointment of a successor
financial vendor.  And in executing an amendment to the Forbearance Agreement, ECF
No. 50-16, Plaintiffs—not Yanez—reaffirmed their obligation to appoint a successor
financial vendor and that time was of the essence.  *Id.* at 3.

It is true that Yanez recommended that the Schools retain their financial vendor, but
the Forbearance Agreement's plain text makes this recommendation immaterial.  Although
he was appointed at the direction of UMB, the language of the agreement indicates that
Yanez was an employee of the Schools once appointed.  Plaintiffs have provided no
authority to support their contention that the involvement of Yanez in the decision, who
was serving a role within the Schools that included the "typical duties of an executive level
business manager," would somehow excuse Plaintiffs' default.  *See* Forbearance
Agreement § II(a)(i)(L).  Plaintiffs have neither suggested nor identified record evidence
showing that Yanez was taking directions from UMB in his role as Interim Business

Manager. At the hearing on this motion, Plaintiffs acknowledged that Yanez is on the Schools' payroll.[3]

No reasonable factfinder could conclude that UMB waived this provision—§ II(a)(ii)—of the Forbearance Agreement. In Minnesota, "[i]gnoring a provision in a contract will constitute waiver if the party whom the provision favors continues to exercise his contract rights knowing that the condition is not met." *BOB Acres, LLC v. Schumacher Farms, LLC*, 797 N.W.2d 723, 727–28 (Minn. Ct. App. 2011) (quoting *Patterson v. Stover*, 400 N.W.2d 398, 401 (Minn. Ct. App. 1987)). UMB did the opposite here. Rather than ignoring the successor financial vendor replacement provision, UMB agreed to an amendment of the timeline for replacement of the vendor, thereby reaffirming that the Schools were still obligated to appoint a successor financial vendor. Regardless, the Forbearance Agreement contained a waiver provision:

> None of the terms or provisions of any of the Bond Documents or of this Forbearance Agreement may be changed, waived, modified, discharged or terminated except by a written instrument executed by the parties or party against whom or which enforcement of the change, waiver, modification, discharge or termination is asserted. None of the terms or provisions of the Bond Documents or this Forbearance Agreement shall be deemed to have been abrogated or waived by reason of any failure or failures to enforce the same.

---

[3]    Plaintiffs should not be surprised by this outcome. Evidence shows that the Schools signed the Forbearance Agreement knowing the financial vendor would not be replaced in compliance with the agreement. ECF No. 51-3 at 51–52.

Forbearance Agreement § IX(b).  The Parties have not executed any written instrument waiving Plaintiffs' obligations under § II(a)(ii).  Accordingly, Plaintiffs' failure to appoint a successor financial vendor breached the Forbearance Agreement as a matter of law.

*The interim-business-manager issue.*  UMB claims that Plaintiffs breached the Forbearance Agreement by failing to provide Yanez with sufficient authority over the financial operations of the Schools.  Section II(a)(i) of the Forbearance Agreement generally required the Schools to each appoint Yanez as Interim Business Manager, with the "exclusive power and duty to manage the financial operations of the Schools." Forbearance Agreement § II(a)(i).  Relevant to this issue, Yanez's powers and duties included:

> D.   Manage and control the Schools' cash management systems, including all disbursements to support the Schools' operating needs; . . .
>
> F.   Participate in each of the Schools' Board of Director finance committee meetings; . . .
>
> H.   Work with the Boards and management teams to identify and implement both short-term and long-term financial stabilization and improvement; . . .
>
> K.   Participate in the Schools' Board meetings and meetings with the Creditor Parties to provide regular updates and provide input/guidance to improve the performance of the Obligated Group; [and]
>
> L.   Perform all other typical duties of an executive level business manager . . ., work collaboratively with all parties-in-interest including but not limited to existing management and employees of the Obligated Group and their advisors[.]

*Id.* UMB argues that Plaintiffs breached Section II(a)(i) of the Forbearance Agreement by (1) failing to comply with Yanez's direction to replenish the debt service reserve fund, and (2) failing to consult Yanez or obtain his approval before committing to pay Plaintiffs' counsel "hundreds of thousands of dollars of legal fees in connection with this action." Def.'s Mem. in Supp. at 21, 32–33 (citations omitted). UMB's argument rests on the assumption that Yanez could override a decision of the Schools' Boards to legally challenge the fees charged by UMB, and UMB's corresponding depletion of the debt service reserve fund.

The Forbearance Agreement, however, is ambiguous regarding the scope of Yanez's authority. Parts of the agreement favor a finding that Yanez's broad authority over "the financial operations of the Schools" could include the authority to direct replenishment of the debt services reserve fund or to approve the payment of legal counsel. Yanez, for example, had the exclusive power and duty to "[m]anage and control the Schools' cash management systems, including all disbursements to support the Schools' operating needs." Forbearance Agreement § II(a)(i)(D). The word "disbursement" is defined as "[t]he act of paying out money, commonly from a fund or in settlement of a debt or account payable" or as "an amount of money given for a particular purpose." *Disbursement*, Black's Law Dictionary (11th ed. 2019). The provision also uses the word "including," which is generally interpreted as introducing a non-exhaustive list of examples. Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 132–33 (2012).

15

At the same time, however, the term "operating needs" is not defined in the agreement, and independent research has not yielded a precise definition or common understanding. The context in which "operating needs" is used indicates it means something akin to "operating expense," which is defined as "[a]n expense incurred in running a business and producing output." *Expense*, Black's Law Dictionary (11th ed. 2019). Yet replenishment of the debt service reserve fund has no connection to expenses incurred in operating the Schools, or really any "needs" of the Schools more generally. Rather, UMB withdrew funds from Plaintiffs' debt service reserve fund to satisfy the invoiced fees and expenses of UMB's attorneys in connection with the negotiation, execution, and enforcement of the Forbearance Agreement. The invoice went unpaid— and ultimately legal counsel was retained—because the Schools contested the reasonableness of the fees. Nothing in this provision, or elsewhere in the Forbearance Agreement, clearly gives Yanez the authority to authorize or veto the Schools' decision to challenge the reasonableness of UMB's charged fees. Yanez is also a mere participant in Board meetings, which suggests that the Schools' Boards retain some measure of authority along with their statutory fiduciary duties. *See* Forbearance Agreement § II(a)(i) ("Participate in each of the Schools' Board of Director finance committee meetings . . . [and] [p]articipate in the Schools' Board meetings and meetings with Creditor Parties to provide regular updates and provide *input/guidance* to improve the performance of the Obligated Group." (emphasis added)); Minn. Stat. § 317A.251 subdiv. 1. This, in turn, suggests that there is some upper limit on Yanez's authority. Further, in the second-to-last bullet in the list of Yanez's duties, the Forbearance Agreement provides that Yanez is to

"[p]erform all other typical duties of an executive level business manager."  Forbearance Agreement § II(a)(i)(L).   The inclusion of this general description of Yanez's responsibilities can be read to provide context for the interpretation of the provision as a whole—meaning Yanez's role is that of an executive level business manager, and the Board retains some measure of authority.   Scalia, *supra*, at 195–98 (describing the application of the *noscitur a sociis* canon).  As the Forbearance Agreement is reasonably susceptible of more than one interpretation regarding the scope of Yanez's authority, it is ambiguous as a matter of law and summary judgment is not warranted on this issue.

*The attorneys'-fees issue.*  UMB claims that Plaintiffs breached Section II(e) of the Forbearance Agreement by refusing to pay UMB's fees.   Section II(e) provides that Plaintiffs are

> obligated to pay all fees and expenses of the Trustee (including, but not limited to, reasonable fees and expenses of its attorneys, advisors and other professionals) in connection with the enforcement or remedies, including negotiation, execution and enforcement of this Forbearance Agreement upon presentment thereof[.]

Forbearance Agreement § II(e).  This provision also establishes payment deadlines, requiring Plaintiffs to pay the fees and expenses of the predecessor trustee, U.S. Bank, "on the Effective Date, and the Trustee and Majority Bondholder's current fees and expenses of its professionals within thirty (30) days of presentment thereof."  *Id.*

After receiving an invoice for fees and expenses on October 12, 2021, Plaintiffs demanded a detailed breakdown of all fees.  ECF No. 51-11; ECF No. 51-12.  Abdalla agreed that Plaintiffs owed UMB additional fees but disagreed with the amount charged.

ECF No. 51-1 at 45.   Ultimately, UMB withdrew funds from Plaintiffs' debt-service-reserve fund to satisfy the October invoices.   ECF No. 20 ¶¶ 29–30; ECF No. 51-14 at 2. Plaintiffs' failure to pay, UMB argues, is a Forbearance Termination Event.   *See* Forbearance Agreement § IV(a)(5) (explaining that a Forbearance Termination Event shall be the occurrence of "[a] violation by the Obligated Group of any of the covenants and obligations set forth herein, including without limitation, the failure to meet any Operating Milestone, Supplemental Reporting, and Fee Payments").

The Schools' obligation to pay any fees, however, necessarily assumes the reasonableness of the fees invoiced.   This would be true if the Forbearance Agreement were silent on the point.   *Campbell v. Worman*, 60 N.W. 668, 669 (Minn. 1894) (finding fee-shifting provisions enforceable "only" to the extent a party proves the "reasonable value of the attorneys' services actually performed").   But it isn't.   The agreement requires that the Schools pay the "*reasonable* fees and expenses of [UMB's] attorneys, advisors and other professionals."   Forbearance Agreement § II(e) (emphasis added).   The reasonableness of the fees invoiced by UMB remains a material factual dispute, meaning this issue cannot be decided on summary judgment.   *Thomton, Sperry & Jensen, Ltd. v. Anderson*, 352 N.W.2d 467, 468 (Minn. Ct. App. 1984) ("It is fundamental that reasonable value of attorneys' fees is a question of fact[.]"); *see also Madsen v. Hanson*, No. A03-1872, 2004 WL 1327780, at *2 (Minn. Ct. App. June 15, 2004) ("What constitutes reasonable attorney fees for legal services is a question of fact."); *United Prairie Bank-Mountain Lake v. Haugen Nutrition & Equip., LLC*, 813 N.W.2d 49 (Minn. 2012) (holding that a bank's claim for the recovery of reasonable attorney fees was a legal, rather than

18

equitable claim, because it was an action seeking a monetary payment for contractual indemnity, and thus the appellants were entitled to a jury trial on attorneys' fees under Article I, Section 4 of the Minnesota Constitution).

If the fees were reasonable, there remains at least a fact question as to whether a Forbearance Termination Event resulted because of nonpayment.  UMB sent the at-issue invoices to Plaintiffs on October 12, 2021, requesting payment for $329,516.31 in fees.  ECF No. 51-11.  Only seventeen days later, on October 29, 2021, UMB withdrew the charged amount from Plaintiffs' debt service reserve fund to satisfy the October invoices.  ECF No. 20 ¶¶ 29–30; ECF No. 51-14.  This withdrawal occurred, and the invoices were satisfied, within the 30-day period prescribed by § II(e) of the Forbearance Agreement.  Forbearance Agreement § II(e) ("For the avoidance of doubt, the Obligated Group agrees to pay . . . the Trustee and Majority Bondholder's current fees and expenses of its professionals within thirty (30) days of presentment thereof.").  In other words, the record is not clear about whether UMB's withdrawal of the funds mooted the issue of Plaintiffs' unwillingness to pay before that date.

*Where this leaves us.*  Plaintiffs' failure to replace the existing financial vendor constituted a Forbearance Termination Event.  The Forbearance Agreement provides that upon the occurrence of a Forbearance Termination Event, the forbearance will terminate, and the Creditor Parties (including UMB) shall have all rights and remedies specified in the Bond Documents available to them.  Forbearance Agreement § IV(b).  Plaintiffs do not dispute that the Bond Documents were breached, or that UMB may exercise its remedies under the Bond Documents.  *See* Pls.' Mem. in Opp'n [ECF No. 54]; *see also* Forbearance

Agreement § I(a). As the forbearance period has terminated, and there is no genuine issue of material fact over whether the Forbearance Agreement was breached, UMB is entitled to summary judgment on its counterclaim for breach of the Bond Documents in this respect. The declaratory judgment UMB seeks in Count III of its counterclaim derives from and concerns this same issue. Thus, UMB is also entitled to a declaratory judgment that Events of Default have occurred under the Bond Documents, a Forbearance Termination Event has occurred under the Forbearance Agreement, and that UMB may exercise its remedies under the Bond Documents. A determination that the Forbearance Agreement was breached necessarily dispenses with the portion of Plaintiffs' declaratory judgment claim in which they allege that they "are not currently in default of any of the covenants or obligations in the Transaction Documents or under the Forbearance Agreement," (Count I), *see* Compl. ¶ 53, and with Plaintiffs' claim for an injunction precluding UMB from exercising its remedies under the Bond Documents and Forbearance Agreement (Count II), *see id.* ¶¶ 54–55. The determination that summary judgment is not appropriate with respect to the attorneys' fees issue means that the Parties' competing claims on that issue are trial-worthy.

III

*UMB's request for entry of judgment.* UMB requests that a Rule 54(b) judgment be entered against Plaintiffs in the amount of $15,595,517.70, which UMB claims represents the outstanding principal and interest due under the Bond Documents. Def.'s Reply Mem. [ECF No. 56] at 7. It also seeks an order directing that it is entitled to foreclose on the collateral, including the mortgaged property. ECF No. 52. Specifically, it seeks

a decree of foreclosure of the Mortgage to satisfy Trustee's judgment, including: (1) that the Mortgaged Property be sold in a manner provided by law and that the proceeds of said sale be applied, first to payment of the costs and disbursements of said sale, and second, on the principal of said judgment; (2) that the purchaser at said sale or its assigns, if no redemption therefrom is made within the 12-month period fixed by statute therefore, be decreed to be the absolute owner of the Mortgaged Property, subject to prior encumbrances of record, if any—there currently are none; (3) that the interest of the Debtors or any other persons claiming an interest in the Mortgaged Property be adjudged and decreed inferior to the Trustee's lien on the Mortgaged Property and all persons claiming under or through the Debtors be foreclosed and barred from any right, title or interest in the Mortgaged Property, except the right of redemption within the period fixed by statute therefore; and (4) that in the event the proceeds of the foreclosure are insufficient to satisfy the Trustee's judgment, that the Trustee have judgment against the Debtors, jointly and severally, for the deficiency, to be enforced as provided by applicable law.

ECF No. 52 at 3–4.

*Rule 54(b)'s basic principles.*   Under Rule 54(b), a court may direct entry of final judgment as to fewer than all claims "only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).   In assessing whether there is no just reason for delay, a "court must consider both the equities of the situation and judicial administrative interests, particularly the interest in preventing piecemeal appeals." *Downing v. Riceland Foods, Inc.*, 810 F.3d 580, 585 (8th Cir. 2016).   "Judgment should be entered 'only if there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal.'" *Fuller v. Hafoka*, No. 19-cv-0886 (PJS/BRT), 2021 WL 4261230, at *1 (D. Minn. Sept. 20, 2021) (quoting *Downing*, 810 F.3d at 585). In undertaking this assessment, courts are to consider:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in setoff against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Downing*, 810 F.3d at 586 (quoting *Hayden v. McDonald*, 719 F.2d 266, 269 (8th Cir. 1983)).

*Rule 54(b) analysis.* The entry of judgment under Rule 54(b) is not appropriate here for a few reasons. (1) Plaintiffs' fee-related claims may result in a setoff against the judgment sought to be made final. (2) There is a risk of a piecemeal appeals process. "The Eighth Circuit Court of Appeals expressly disfavors Rule 54(b) appeals 'where the adjudicated and pending claims are closely related and stem from essentially the same factual allegations.'" *Regents of the Univ. of Minnesota v. United States*, No. 17-cv-3690 (DSD/ECW), 2021 WL 7209502, at *2 (D. Minn. Feb. 23, 2021) (quoting *Outdoor Cent., Inc. v. GreatLodge.com, Inc.*, 643 F.3d 1115, 1119 (8th Cir. 2011)). "Where each claim 'requires familiarity with the same nucleus of facts and involves analysis of similar legal issues,' the claims 'should be resolved in a single appeal.'" *Id.* The facts underlying Plaintiffs' unadjudicated claims are intertwined with the claims resolved here, as both claims involve a breach of the same Forbearance Agreement. (3) UMB has not cited persuasive authority to support this request. At the hearing, UMB argued that the foreclosure process takes six to nine months, and that this would constitute undue delay.

The prospect of a six-to-nine-month foreclosure process, given the amounts at issue, is not an adequate showing of hardship. UMB's request for entry of judgment under Rule 54(b) will be denied.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendant UMB Bank, N.A. as Trustee's Motion for Partial Summary Judgment is **GRANTED IN PART** as follows:

1. Plaintiffs Rochester Math & Science Academy, Rochester Stem Academy Inc., and Rochester MSA Building Company materially breached the Bond Documents and Forbearance Agreement. UMB is entitled to exercise its remedies thereunder except as otherwise provided herein.

2. UMB is entitled to summary judgment on the portion of Plaintiffs' declaratory judgment claim wherein they allege "Plaintiffs are not currently in default of any of the covenants or obligations in the Transaction Documents or under the Forbearance Agreement," and the separate claim for an injunction precluding UMB from exercising its remedies under the Bond Documents and Forbearance Agreement.

3. UMB's request that judgment be entered against Plaintiffs under Rule 54(b) is **DENIED**.

Date: April 17, 2023                          s/ Eric C. Tostrud
                                              Eric C. Tostrud
                                              United States District Court